# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 24

OCTOBER TERM, A.D. 2024

February 28, 2025

ROBERT E. SCHROTH and LINDA M.
SCHROTH, Trustees of the ROBERT E. and
LINDA M. SCHROTH REVOCABLE
LIVING TRUST dated 8/20/2004;
ANTHONY SCHROTH; and JACKSON
HOLE WINERY, LLC, a Wyoming limited
liability company,

Appellants
(Defendants),                                     S-24-0158

v.

ROBERT G. KIRK and VIESIA T. KIRK,
husband and wife,

APPELLEES
(Plaintiffs).

*Appeal from the District Court of Teton County*
*The Honorable Peter H. Froelicher, Judge*

*Representing Appellants Robert Schroth & Linda Schroth:*
    Bret F. King and Spencer B. King of King & King, LLC, Jackson, Wyoming.

*Representing Appellants Anthony Schroth & Jackson Hole Winery, LLC:*
    Mark D. Sullivan of Mark D. Sullivan, P.C., Wilson, Wyoming. Argument by Mr.
    Sullivan.

*Representing Appellee:*
    William P. Schwartz & Leah C. Schwartz of Parsons Behle & Latimer, Jackson,
    Wyoming. Argument by Mr. Schwartz.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1] Appellants Robert, Linda, and Anthony Schroth, and Jackson Hole Winery, LLC (collectively "Appellants"), appeal from the district court's final order and judgment permanently enjoining them from conducting certain commercial activities in a residential subdivision. Appellants allege the district court erred when it found their activities violate the Dairy Subdivision's Covenants, and the district court abused its discretion when it found the equities weighed in favor of granting a permanent injunction and declined to apply laches to bar the claims brought by Appellees, Robert "Jerry" and Viesia Kirk (Kirks). We affirm.

## ISSUES

[¶2] Appellants raise three issues which we rephrase as follows:

> I. Do Jackson Hole Winery's activities violate the Dairy Subdivision's Covenants?
>
> II. Did the district court abuse its discretion when it declined to apply laches to bar the Kirks' claims?
>
> III. Did the district court abuse its discretion when it found the equities weighed in favor of granting the Kirks a permanent injunction?

## FACTS

[¶3] Jerry and Viesia Kirk purchased two adjacent 18 acre lots in the Dairy Subdivision in Teton County in 1997 and 1998. The Kirks built a home on one of the lots and placed the other under a conservation easement. Robert and Linda Schroth[1] purchased Lot 3B of the Dairy Subdivision in 1991 or 1992. The Dairy Subdivision is subject to a "Declaration of Covenants, Conditions and Restrictions" recorded in the Teton County Clerk's office (the "Covenants"). Section 1 of the Covenants states the purpose is "to preserve and maintain the natural character and value of the property for the benefit of all the owners of the property or any part thereof." Section 7 of the Covenants sets forth limitations on the development and use of the properties within the subdivision. Section 7(b) of the Covenants authorizes only single-family residential use of the lots in the subdivision, and Section 7(c) sets forth certain prohibited activities:

> (c) <u>Prohibited Uses.</u> No commercial, industrial or other non-

---

[1] Because several of Appellants have the same last name, we will refer to Robert and Linda collectively as the Schroths, and we will use their first names when referring to Robert, Linda, or Anthony individually.

1

single family residential use whatsoever shall be permitted; however, up to a maximum of 25% of the usable floor area of a dwelling may be used for certain home occupations such as a studio, workshop, for artistic pursuits, recreational and such other endeavors not requiring access to the premises by the general public nor requiring the employment of labor other than the owner. The Declarant, its successors or assigns, shall have the right to construct a sales office with road access thereto, for the purpose of assisting in the marketing of the development. The Declarant shall also have the right to continue all uses and activities presently existing on Lot 3 without constituting any violation of the covenants. But no other manufacturing or commercial enterprise of any type shall be maintained upon the premises. The above notwithstanding, haying, farming, and other agricultural activity may be performed on the property and such activity shall not be considered a commercial operation, even if the harvest therefrom is sold or otherwise consumed for commercial purposes, provided, however, that there shall be no "high density" animal, poultry, fowl, fish or other high intensity commercial farming activities allowed on the Property whatsoever.

[¶4]    Section 7(u)(4) also prohibits any activity beyond what was contemplated in the Covenants that would "unreasonably disturb[] or harass[] wildlife." Section 4 of the Covenants created a homeowners' association (HOA) to handle the business of the Subdivision. Section 6 of the Covenants created a "Design Committee" that was "responsible for reviewing construction plans and specifications, issuing building permits, and tak[ing] all other actions necessary to carry out the responsibilities delegated to them by the Association."

[¶5]    On December 9, 2010, the Schroths sought approval from Louise Wade, who was the president of the HOA and a member of the Design Committee, to operate a winery on Lot 3B. This letter stated:

> Dear Louise,
>
> I am writing to tell you about a family venture my family and I would like to pursue at our property [on Lot 3B.] You may have already read something about it in the newspaper. We would like to start a winery using the existing building we have on our property to age wine in wooden barrels and store them for 12 to 18 months at which time the

2

wine would be bottled and sold to local markets. We have not done anything thus far and it was our intention to first see if it was even possible to obtain a permit before approaching the homeowners about our venture.

To fill you in, we have applied for and were granted a permit to operate a winery, using our garage to make wine and store it. We have not applied for and do not intend to have a tasting room or otherwise open the winery to the public. There will not be any employees nor commercial traffic at the property. We would like to make small lots of several different varietals to sell to local restaurants and liquor stores.

My son Anthony is a winemaker in Sonoma County California, were he went to school and received a degree in winery operations. He will be the winemaker and grow and purchase grapes mainly in California for shipment to Jackson where we will make it into wine.

It is not our intention to violate any of the [Covenants] of the association. Our property is unique in that it was originally the Spring Creek Dairy, a working dairy farm with approximately 75 milk cows. They produced and bottled milk and cream and other dairy produce for sale to the valley residents.

We would like the directors of the homeowners association to give us the go ahead for this venture before we go any further. Of course we are available for any questions and would be happy to show you where we would like to make the wine and store it. Making wine is a simple process that does not produce any waste or harmful by products other then water and grape stems.

On December 11, 2010, based on the representations in Robert's letter, Ms. Wade reached out to another member of the Design Committee, Bill Healy, asking him to approve the Schroths' request. Ms. Wade informed Mr. Healy there would be "no sales" of wine on Lot 3B, their venture would have no employees, would cause no traffic, and would require no new buildings. She also informed him the other member of the Design Committee, Jim Hesser, agreed the enterprise should be approved. On December 23, 2010, Ms. Wade sent the Schroths the following email:

Bob * Linda,
   On this beautiful winter day it gives me a great deal of pleasure to inform you that the Design Committee of the Dairy has approved your request to have a winery as long as no employees or business carried on at your property.

3

All the best !
Look forward to drinking a toast to your winery!
Lou

[¶6]    The Schroths started Jackson Hole Winery (the "Winery") and began making wine in their barn in 2011. The Design Committee's approval of the Schroths' request to operate the Winery on Lot 3B was announced to the other homeowners, along with the approval of several other "various projects within the subdivision," at the annual HOA meeting held in September 2011.

[¶7]    For reasons that are not entirely clear, in the fall of 2013, some of the residents of the Subdivision started questioning whether the Winery was an agricultural activity, which was permitted by the Covenants, or a prohibited commercial activity. This prompted Ms. Wade to send an email to the residents informing them the Winery should not be considered a commercial activity. She stated in this email: "The sale of the wine does not take place in the home. There has been no sign of commerce taking place. They simply make the wine in their barn and sell it in town."

[¶8]    Also in 2013, Teton County became aware the Schroths were operating the Winery in the Dairy Subdivision. Teton County informed the Schroths they needed to obtain a conditional use permit (CUP) to comply with Teton County's land development regulations (LDRs). During the process of applying for the CUP, the Schroths learned the definitions in the LDRs needed to be amended to include a winery in the list of approved home occupations.

[¶9]    While seeking an amendment of the LDRs, the Schroths submitted a memo to the Teton County Commissioners where they represented the Winery did not sell wine by the glass or offer food, and it had no desire to do so in the future. The Schroths also indicated they had hosted visitors for wine tastings in the past, but whether they continued to do so would be considered as part of the future CUP. The Schroths further represented the Winery's only outdoor activities involved unloading the grapes when they were delivered from California, which only occurred for 10 to 12 days each year, and rinsing the wine barrels two to three times a year.

[¶10] After receiving public comment, Teton County amended its LDRs to include wineries as an approved home occupation. The Teton County's LDRs placed certain restrictions on a home business winery, including allowing the sale of wine produced at the winery only for consumption off the premises and prohibiting public tours of the home business winery. Teton Co. LDRs § 6.1.11(E)(3)(j). Teton County's LDRs placed restrictions on all approved home occupations. For example, home businesses could not "change the residential character of the site or adversely affect the uses permitted in the zone in which it [was] located." Teton Co. LDRs § 6.1.11(E)(3)(a). In addition, home businesses were limited to having a total of three employees, and once those businesses

4

grew beyond a certain size and could no longer be characterized as home businesses, they were expected to relocate. Teton Co. LDRs §§ 6.1.11 (E)(1), (E)(3)(c).

[¶11]   After the Teton County LDRs were successfully amended, the Schroths applied for a CUP.  Throughout this process, the Schroths represented "[n]o additional development [was] proposed," and the Winery's business would occur inside existing structures, "not within view of the public road."  The Schroths' application indicated the Winery would continue to limit itself to processing and manufacturing grapes into wine for shipment purposes, it would only sell wine for off-site consumption, and it would not conduct any public tours.  The application also indicated there would not be more than three employees at any time, and there would not be any public display of merchandise connected to the winery.

[¶12]   In April 2015, Robert asked Ms. Wade[2] to write to the Teton County Commissioners to express the Dairy Subdivision's support of their CUP application.  He indicated they were seeking a "full blown winery" that included "manufacturing the wine in [their] barns, aging the wine in barrels, bottling wine, storing the wine, and having a tasting room, all in [their] barns."  Ms. Wade sent the following email to the Commissioners:

> I am an advocate of having the winery in our neighborhood to promote aspiring entrepreneurs to start up a business, as the Schroth's started for their sons.
> When they grow larger they will move but for now having the winery in the barn is a way to get started with low overhead without the cost as renting which would be expensive in an industrial site.  Most importantly there are no effects on our neighborhood.
>
> One commissioners was [sic] concerned that allowing a winery in home would lead to others doing the same and that would bring commerce to neighborhoods around Jackson.
> Understand that the wine is made in the barn then taken to town to sell.  But if permission is not granted for making wine in home others will do it behind closed doors in a bootlegger fashion and here you go with a prohibition type scenario going on around Jackson without paying for a permit at all which then would be a loss of revenue to Federal, state and county government.

After giving public notice of the application and conducting public hearings, Teton County approved the Winery's CUP on February 16, 2016.

---

[2] Ms. Wade was no longer HOA president, but she was still a member of the Design Committee at this time.

[¶13]   The amendment of the LDRs and the approval of the CUP were not discussed at the 2014 or 2015 HOA meetings.  Despite the public notices that had been issued regarding these proceedings, the Kirks were unaware of the amendments to the LDRs or the Winery's 2015 CUP application.

[¶14]   The Winery proved to be successful, and the Schroths expanded their production and sold out their entire inventory every year.  The Winery's revenue steadily increased every year, growing from just over $100,000 in 2012 to over $2 million in 2022.  At some point, Appellants created a website for the Winery that invited guests to "come enjoy a glass of wine inside our tasting room and enjoy breathtaking views of Jackson Hole."  Sometime in 2017, the Winery started increasing the amount of wine tastings it held on Lot 3B.  Some of these tastings included groups of 30–50 people.  The Schroths asserted the only events the Winery held on their property were wine tastings because they charged a "tasting fee" instead of a "site fee."  However, they admitted some of these "tastings" involved outside event planners and outside catering companies serving food to Winery customers.  The Winery charged guests a "per person" fee during these tastings, and these guests were allowed to drink an unlimited amount of wine while on the premises.

[¶15]   In 2019 and 2020, the Schroths made over $160,000 of improvements to the facilities on Lot 3B, including demolishing an existing building and constructing an office, installing two bathrooms in the barn, including one that complies with the Americans with Disabilities Act, installing a sewage/wastewater system that can handle up to 30 people per day, making other improvements to the tasting room inside of the barn, and improving the outdoor patio and deck.

[¶16]   In September 2020, the Kirks visited the Winery for a friend's birthday party.  They were given a tour of the facility and participated in a wine tasting under a tent the Schroths had erected on the patio.  The Kirks believed the tent was a temporary Covid precaution, and they understood from other guests at the party that the Schroths were looking for other facilities in Jackson to relocate their winemaking activities.

[¶17]   Shortly after this party, the Kirks traveled to their other home in Florida.  They both contracted Covid in early 2021.  They remained in Florida for most of late 2020 through early 2022.

[¶18]   In late 2021, nearby landowners complained to Teton County claiming the Winery was operating beyond the standards for a home business winery.  They alleged it was employing more than three employees, it was hosting public events that included food service, and it had been offering public tours of the Winery.  In December 2021, Teton County asked the Schroths to respond to the complaints that the intensity of the Winery's operation was no longer suitable for a residential zone.  The Schroths responded by applying to amend their CUP to request permission to have tastings under the tent on the

patio, to sell wine by the glass, and to have more part-time employees. Over 80 public comments were received by the Teton County Planning Department in response to the 2022 amended CUP application. The Kirks, the HOA, and numerous nearby landowners voiced strong opposition to the application, including pointing out the requested activities violated the Covenants. In spite of this opposition, Teton County issued the Schroths an amended CUP, with certain conditions, including: limiting the number of guests to 30 per day; prohibiting by the glass wine sales; prohibiting tours of the Winery and any food service, including by outside vendors; limiting the hours wine tastings could be held; and prohibiting the use of any amplified music. After receiving the 2022 Amended CUP, the Schroths leased the outbuildings on Lot 3B to the Winery through January of 2027 for $6,000 per month.

[¶19] After Teton County approved the amended CUP, the Kirks asked the HOA to enforce the Covenants against the Schroths and the Winery. After it became apparent the HOA would not do so, the Kirks filed their own suit seeking declaratory and injunctive relief in November 2022. The Kirks' complaint alleged the Schroths were engaging in prohibited commercial activities, which they referred to as "Commercial Winery Activities," including: high intensity wine production; the sale and marketing of wine produced on Lot 3B; the hosting of wine tastings on Lot 3B; the hosting of high-end weddings and other events on Lot 3B; the placing of a tent and other improvements to support a commercial winery on Lot 3B; the placing of advertising signs for the winery; the employment of multiple persons; and the conversion of Lot 3B into the principal place of business and world headquarters for a commercial winery. The Kirks sought a declaratory judgment that the Commercial Winery Activities violated the Covenants and a permanent injunction prohibiting the Schroths and the Winery from engaging in those Commercial Winery Activities on Lot 3B.

[¶20] The Kirks moved for summary judgment on both of their claims. They asserted the HOA did not have the authority to approve the Winery's operation in 2010, but they were not going to challenge that approval. They only sought to enjoin the activities that went beyond the scope of that permission. The Kirks alleged the Commercial Winery Activities unquestionably violated the Covenants, and they were entitled to a permanent injunction and attorney's fees for enforcing the Covenants. Appellants filed their own summary judgment motion, asserting the Winery's activities were agricultural, not commercial, and therefore allowed under the Covenants. They also alleged the Kirks' claims were barred by laches.

[¶21] After holding a hearing on the competing summary judgment motions, the district court issued a written order granting the Kirks' motion for summary judgment and denying the Schroths' motion. The district court found the Winery's activities were commercial and violated the Covenants. It further found the Kirks' claims were not barred by laches, and the equities weighed in favor of granting the injunction. The district court enjoined

the Appellants from engaging in any activity on Lot 3B other than the limited activities approved by the Design Committee in 2010.

[¶22] Appellants filed a motion for a new trial or to alter or amend the judgment under Rule 59(a) and (e) of the Wyoming Rules of Civil Procedure (W.R.C.P.). They claimed they had newly discovered evidence showing the Kirks knew about some of the Winery's commercial activities earlier than previously thought, and the district court should reconsider its laches decision. The district court denied the Schroths' W.R.C.P. 59 motion. This appeal timely followed.

## DISCUSSION

### I. *Do Jackson Hole Winery's Activities Violate the Dairy Subdivision's Covenants?*

[¶23] The district court found the Winery's "current operations" on Lot 3B were "commercial," and violated the Covenants. The district court further found the Winery's activities violated the Covenants by allowing public access to the property and by employing individuals other than the Schroths. Appellants do not dispute the Covenants prohibit "commercial, industrial or other non-single family residential use" within the Dairy Subdivision. They also do not dispute the Covenants permit home occupations that do not require access to the premises by the general public or the employment of outside labor. Instead, they contend the Winery's activities fall within the agricultural exception to the Covenants.

[¶24] "The interpretation of unambiguous covenants is a proper subject for a motion for summary judgment." *Rafter J. Ranch Homeowner's Ass'n v. Stage Stop, Inc.*, 2024 WY 114, ¶ 17, 558 P.3d 562, 569 (Wyo. 2024) (*Rafter J.*) (citing *Omohundro v. Sullivan*, 2009 WY 38, ¶ 8, 202 P.3d 1077, 1081 (Wyo. 2009)). We apply the following standard of review:

> Summary judgment can be sustained only when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. We review a grant of summary judgment deciding a question of law de novo. We accord no deference to the district court on issues of law and may affirm the summary judgment on any legal grounds appearing in the record.

*Id.* (internal citations omitted) (quoting *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 2017 WY 46, ¶ 24, 393 P.3d 1279, 1289 (Wyo. 2017)) (internal citations omitted). "[T]he interpretation of covenants imposing restrictions or conditions on the use of land is a question of law we review *de novo*." *Id.* at ¶ 18, 558 P.3d at 569 (quoting *Gumpel*, ¶ 25, 393 P.3d at 1289).

[¶25]   Section 7(c) of the Covenants states "[n]o commercial, industrial or other non-single family residential use whatsoever shall be permitted[,]" but it also provides "agricultural . . . activity shall not be considered a commercial operation, even if the harvest therefrom is sold or otherwise consumed for commercial purposes. . . ."  The Covenants do not define agricultural or commercial.

[¶26]   The words used in a covenant "are afforded the plain meaning that a reasonable person would give to them." *Rafter J.*, 2024 WY 114, ¶ 21, 558 P.3d at 569 (citing *Winney v. Hoback Ranches Prop. Owners Improvement Dist. and Serv. Dist.*, 2021 WY 128, ¶ 47, 449 P.3d 254, 266 (Wyo. 2021)) (*Winney I*).  "[W]e interpret covenants as a whole and read each provision in light of the other provisions to find the plain meaning." *Id.* at ¶ 23, 558 P.3d at 570 (citing *Gumpel*, ¶ 29, 393 P.3d at 1290).  "We avoid interpreting provisions in a way that makes the other provisions inconsistent or meaningless." *Id.* (quoting *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016)).

[¶27]   Appellants assert we should apply the dictionary definition of the word agriculture, which means: "the science, art, or practice of cultivating the soil, producing crops, and raising livestock and in varying degrees the preparation and marketing of the resulting products."  https://www.merriam-webster.com/dictionary/agriculture.   They assert the "preparation and marketing of wine," is "clearly an agricultural product," and falls under this definition, making the Winery's activities agricultural rather than commercial.

[¶28]   Section 7(c) of the Covenants is like the covenant we interpreted in *Winney I*, which stated: "All lands covered by this deed shall be used for residential purposes only, and no commercial activity shall be conducted or permitted thereon." 2021 WY 128, ¶ 4, 499 P.3d at 257.  When discussing the meaning of the word "commercial" as used in that covenant, we stated:

> The plain meaning of "commercial" is "occupied with or engaged in commerce or work intended for commerce" and "of or relating to commerce." *See* https://www.merriam-webster.com/dictionary/commercial.  Black's Law Dictionary defines it as "of, relating to, or involving the buying and selling of goods; mercantile"; "resulting or accruing from commerce or exchange"; "employed in trade; engaged in commerce"; "manufactured for the markets; put up for trade"; "of, relating to, or involving the ability of a product or business to make a profit"; and "produced and sold in large quantities." Commercial, Black's Law Dictionary (11th ed. 2019).  The plain meaning of "commerce" is "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." *See* https://www.merriam-

webster.com/dictionary/commerce. Similarly, Black's Law Dictionary defines "commerce" as "the exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries." Commerce, Black's Law Dictionary (11th ed. 2019). These definitions are clear. The covenant prohibiting commercial activity prohibits a landowner from conducting or allowing the exchange of goods or services involving transportation from place to place on his property.

*Id.* at ¶ 64, 499 P.3d at 270.

[¶29] The Winery's activities do not involve "the science, art, or practice of cultivating the soil, producing crops, and raising livestock. . . ." *See* https://www.merriam-webster.com/dictionary/agriculture. If, as originally approved by the Design Committee, the Schroths merely made wine in the barn and took it to town to sell, it might fall under Appellant's proposed definition of agricultural because it would involve "the preparation and marketing" of agricultural products. However, the Winery's expanded activities fit within the definition of "commercial" we discussed in *Winney I*. The Winery's activities on Lot 3B unquestionably involve "conducting or allowing the exchange of goods or services involving transportation from place to place." The Winery currently ships wine to locations throughout Wyoming and numerous other states, holds wine tastings where members of the public can purchase wine and other merchandise that are not agricultural products, and generates revenue of over $2 million.

[¶30] Our finding the Winery's activities are commercial rather than agricultural is further supported by Teton County's LDRs and Wyoming Statutes. During the public comment phase of the LDR amendment process, Teton County defined a home business winery as a commercial enterprise:

> "Winery" means a commercial enterprise used for the purpose of processing grapes and other fruit products to produce, bottle and ship wine or similar non-distilled spirits. A winery may include crushing of fruit, fermenting processes, storage of bulk or bottled wine made on the premises and related activities as may be permitted by State law[.]"

This comports with the definition of a winery in Wyoming Statute § 12-1-101(xx) (LexisNexis 2023), which defines a winery as "a commercial enterprise manufacturing wine at a single location in Wyoming[.]"

[¶31] When the Design Committee approved the Schroths' request to make wine in their barn in 2010, they did so with conditions: 1) the Schroths would not have any outside

10

employees; and 2) no business would be conducted on Lot 3B. As long as no wine was being sold on the property, an argument could be made that these activities were permitted under the Covenants because, as Ms. Wade assured the other homeowners in 2013, no commerce was taking place on the property. However, when the Schroths expanded their activities and started selling wine and merchandise on the property, allowing the property to be accessed by members of the public, hiring outside employees, and hosting large scale commercial events, their activities could no longer be considered agricultural, and unquestionably violated the Covenants. Although Teton County may have authorized some of these activities, that approval does not override or excuse a violation of the Covenants. *See Brazinski v. Bd. of Cnty. Comm'rs of Teton Cnty.,* 2024 WY 40, ¶ 26, 546 P.3d 545, 553 (Wyo. 2024) (citing *Wimer v. Cook,* 2016 WY 29, ¶ 26, 369 P.3d 210, 220 (Wyo. 2016) ("Approval of a land use plan by the county zoning authority does not override a violation of the covenants, which can be enforced in a private action between landowners.").

[¶32] Appellants argue even if the Winery's activities violate the Covenants, their expanded activities were approved by the HOA. They base this assertion on Robert's April 2015 letter to Ms. Wade asking her to write to the Teton County Commissioners about the HOA's position on having a home business winery in the Dairy Subdivision. In this letter, Robert sought approval for a "full-blown winery," including a tasting room. However, Ms. Wade's email to the Commissioners demonstrates she did not believe the Schroths were asking for approval of anything beyond what the HOA permitted in 2010. She informed the Commissioners the wine would be made in the barn and taken to town to sell. She was not advocating for the Schroths to sell wine or merchandise or hold large public events on Lot 3B. During her deposition, she testified she did not think the Schroths sold wine or anything else on Lot 3B, she did not know if they charged fees for the wine tastings, and she did not know if they had any employees. She also testified that as a member of the Design Committee, she never voted on or considered any expansion of the Schroths' operations. The person who succeeded Ms. Wade as president also testified the Schroths never asked the HOA or the Design Committee to approve an expansion of their activities, and no such permission was ever granted.

[¶33] Even assuming such permission had been granted, the HOA board, president, and Design Committee did not have the authority to override or amend the Covenants. The HOA board, president, and Design Committee are governed by the Covenants, the articles of incorporation, and bylaws of the HOA. Neither the Covenants nor the bylaws give the HOA board, president, or Design Committee the ability to amend the Covenants or approve non-conforming uses. The power to amend the Covenants is reserved to the membership of the HOA. Pursuant to Section 13, the Covenants can only be amended, modified, or altered by the written consent of the owners of 70% or more of the lots in the subdivision. No such amendment was done either in 2010 or 2015, and Robert unsuccessfully attempted to get the other homeowners to approve such an amendment in 2022.

11

[¶34]  The Schroths expanded the activities they allowed the Winery to conduct on Lot 3B to include commercial activities that violated the Covenants.  The HOA president and Design Committee did not approve, nor did they have the authority to approve, those expanded activities.  The HOA membership never approved those expanded activities by amending the Covenants to allow commercial activities to occur on Lot 3B.  Because the Winery's expanded activities are commercial, the district court correctly found the Kirks were entitled to a declaratory judgment that the Appellants were violating the Covenants.

## II.    Did the district court abuse its discretion when it declined to apply laches to bar the Kirks' claims?

[¶35]  Appellants claim that even if their activities violate the Covenants, the Kirks are barred from pursuing their claims under the doctrine of laches because "they consciously failed to act for more than a decade."  The Kirks assert Appellants cannot establish the necessary elements of laches or "that they are entitled to equitable relief under broader 'considerations of justice.'"

[¶36]  As discussed above, we review a summary judgment ruling de novo. *Rafter J.,* 2024 WY 114 ¶ 17, 558 P.3d at 569 (quoting *Gumpel,* 2017 WY 46, ¶ 24, 393 P.3d at 1289); *James v. James*, 2021 WY 96, ¶ 23, 493 P.3d 1258, 1264 (Wyo. 2021).  "Laches is an equitable defense, and its applicability depends upon the circumstances of each case." *Moncrief v. Sohio Petroleum Co.,* 775 P.2d 1021, 1024–25 (Wyo. 1989) (citations omitted). "The existence of laches is a question addressed to the sound discretion of the district court." *Id.* (citations omitted).  Our review focuses on whether the trial court abused its discretion when it chose not to invoke the doctrine of laches. *See id.* (citations omitted). When the undisputed facts in the record establish, as a matter of law, that laches does not bar a party's claims, we can affirm summary judgment on that basis. *See Tram Tower Townhouse Assoc. v. Weiner*, 2022 WY 58, ¶ 43, 509 P.3d 357, 366–67 (Wyo. 2022) (affirming the application of laches on summary judgment).

[¶37]  "Laches bars a claim when a party has delayed in enforcing its rights to the disadvantage of another." *Peterson v. Laramie City Council*, 2024 WY 23, ¶ 11, 543 P.3d 922, 927 (Wyo. 2024) (quoting *EOG Res., Inc. v. JJLM Land, LLC,* 2022 WY 162, ¶ 33, 522 P.3d 605, 614–15 (Wyo. 2022)).  The party asserting laches must establish two elements: "1) inexcusable delay; and 2) injury, prejudice, or disadvantage to the defendants or others." *Id.*  "The existence of laches is primarily determined not by lapse of time but by considerations of justice." *Id.*  We agree with the district court that Appellants failed to establish either of these two elements.

### A. Appellants Failed to Prove Inexcusable Delay

[¶38]  The district court found the earliest date the Kirks could have brought their claim was in September 2020.  It found Appellants failed to offer any evidence the Kirks could

12

have discovered the facts surrounding the Winery's operations that gave rise to their claims with reasonable diligence prior to that date. On appeal, Appellants assert the district court abused its discretion when it found there was no inexcusable delay. They assert the Kirks either had actual notice the Winery was a commercial business in 2011 or were "at least on inquiry notice" about the Winery's activities prior to 2020.[3] The Kirks assert they trusted the Schroths' assertions that they were making wine in their barn, and the written confirmation from Ms. Wade that no commerce was taking place on the property. They claim their attendance at the birthday party in 2020 did not "reveal the full scope of the Winery's expanded business," but even if this was enough to put them on "inquiry notice" of the Schroths' Covenant violations, given the worldwide Covid pandemic, bringing their claim two years later was "neither long nor 'inexcusable.'"

[¶39] "There is no set length of delay that will be considered undue or inexcusable; the circumstances of each case must be considered in making that determination." *Tram Tower Townhouse Ass'n*, 2022 WY 58, ¶ 45, 509 P.3d at 367 (quoting *Windsor Energy Grp., L.L.C. v. Noble Energy, Inc.*, 2014 WY 96, ¶ 25, 330 P.3d 285, 292 (Wyo. 2014)). "Laches may be invoked only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his or her cause of action and will not be invoked absent knowledge or notice of the wrong." *Peterson*, 2024 WY 23, ¶ 14, 543 P.3d at 928 (quoting 27A Am. Jur. 2d *Equity* § 139 (2024)). "The diligence which courts require in the enforcement of one's rights if he is to avoid laches assumes that there is knowledge of an adverse claim." *Torgeson v. Connelly*, 348 P.2d 63, 69 (Wyo. 1959). To determine if the Kirks' claims were barred by laches, we must identify the earliest time they could have brought their claims and then analyze the amount of time that passed between then and when they filed their claims. *Tram Tower Ass'n*, ¶ 45, 509 P.3d at 367 (citing 30A C.J.S. Equity § 151 (Mar. 2022 Update)).

[¶40] The dispute in this case centers around when the Kirks had or should have had notice the Schroths were operating a commercial enterprise on Lot 3B in violation of the Covenants. As discussed above, although the Kirks knew about the HOA's initial approval of the Schroths' request to make wine in their barn, they did not have actual notice of the Winery's expanded activities until they attended the party in September 2020. The question then becomes whether they had or should have had "inquiry notice" of those

---

[3] Both parties moved for summary judgment asserting there were no disputed issues of material fact. On appeal, Appellants are not claiming there is a question of material fact about when the Kirks had notice of their activities. They maintain the facts in the record are sufficient to establish undue delay as a matter of law. "We 'will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.'" *Pettengill v. Castellow,* 2022 WY 144, ¶ 24, 520 P.3d 105, 113 (Wyo. 2022) (quoting *Statzer v. Statzer*, 2022 WY 117, ¶ 24, 517 P.3d 574[, 581–82] (Wyo. 2022)). Therefore, we will not address whether the district court erred when it found there were no disputed issues of material fact regarding the notice factor. However, even if there is a question of fact about when the Kirks had notice of Appellants' activities, as discussed below, they also failed to prove injury, prejudice, or disadvantage, and the Kirks would still be entitled to summary judgment.

13

activities prior to that date.  We generally apply "inquiry notice" in cases involving deeds and title defects. *See, e.g., Martin v. Sec. State Bank*, 2021 WY 106, ¶¶ 14–18, 496 P.3d 371, 376–77 (Wyo. 2021) (finding the bank did not have inquiry notice of an equitable lien, which was an infirmity in a deed); *Grose v. Sauvageau*, 942 P.2d 398, 403 (Wyo. 1997) (finding no inquiry notice of a title dispute because a neighbor's possession of the property was consistent with the rights of the record owner).  We have also applied "inquiry notice" in statute of limitations cases. *See, e.g.*, *Hiltz v. Robert W. Horn, P.C.*, 910 P.2d 566, 569 (Wyo. 1996) (holding if the uncontroverted facts show a reasonable person should have been placed on inquiry notice regarding the statute of limitations, the court can resolve the question as a matter of law on summary judgment).  "A party has inquiry notice when it has 'knowledge of facts so informing that a reasonably cautious person would be prompted to inquire further.'" *Martin*, ¶ 14, 496 P.3d at 376 (quoting *Wyo. Bank & Tr. v. Haught*, 2003 WY 111, ¶ 10, 76 P.3d 301, 306 (Wyo. 2003)).  "Inquiry notice is based on the premise that the failure to make inquiry by someone with sufficient knowledge to create a duty to do so will be attributed to their own negligence.  The loss resulting from such negligence will not be relieved in a court of equity." *Grose*, 942 P.2d at 403 (citing *North Am. Uranium, Inc. v. Johnston*, 316 P.2d 325, 329 (Wyo. 1957)).

[¶41]   Assuming for the purposes of this case that inquiry notice applies to laches, we agree with the district court the undisputed facts show the Kirks would not have been prompted to make further inquiry until 2020 at the earliest.[4]  The Winery's activities were ever evolving.  The Kirks had no actual knowledge of the 2015 CUP application.  Even if they had read the notice that was published in the local paper or participated in the public hearings, the 2015 CUP application indicated there would be no development, no new buildings, no public tours, the Winery would conduct "private" tastings within the existing buildings, and wine would only be sold for off premises consumption.  The public wine tastings did not start until 2017.  The substantial improvements to the tasting room and patio were not made until 2019–2020.  Most of the large group wine tastings, and those with outside event planners and caterers, took place from 2020–2022, when the Kirks were in Florida.  The Kirks attended a birthday party at the Winery in September 2020, where they personally observed the event was held outside, under a tent, and they were given a tour of the facility.  At this time, a reasonably cautious person would have been prompted to inquire further. *Martin*, 2021 WY 106, ¶ 14, 496 P.3d at 376 (quoting *Haught*, 2003 WY 111, ¶ 10, 76 P.3d at 306).  However, other guests at the party led the Kirks to believe the Schroths were looking to move their operations to more appropriate locations.  Only after the Schroths filed for the amended CUP in 2022 did the Kirks know Appellants intended

---

[4] Even if we consider Appellants' allegations in the W.R.P.C. 59 motion that Jerry Kirk purchased a case of wine in 2017 and received occasional marketing emails from the Winery after that date, it does not change this analysis.  Most of the activities to which the Kirks object, particularly the large, public wine tastings on the outdoor patio, did not occur until after the improvements were made in 2019–2020.  One visit to the Winery by an agent of the Kirks in 2017 to pick up the wine and reading the emails attached to the Rule 59 motion, which mostly discussed special promotions and free shipping, would not have put the Kirks on inquiry notice of the Winery's expanded activities.

14

to continue operating within the Dairy Subdivision in violation of the Covenants. They filed this action as soon as it became apparent the HOA was not going to enforce the Covenants.

[¶42] Although there was some indication in 2020 the Schroths were violating the Covenants, it was not clear a controversy had arisen until the filing of the 2022 amended CUP application. Therefore, the district court could reasonably conclude the Kirks did not delay in filing their suit, and it did not abuse its discretion when it found Appellants failed to prove the delay element of laches. *See Carahan v. Lewis*, 2012 WY 45, ¶¶ 29, 34–35, 273 P.3d 1065, 1074, 1076 (Wyo. 2012) (finding no delay where, although there was some sign of a possible controversy at an earlier date, it was not clear the controversy had arisen until just before the suit was filed).

## B. Appellants Failed to Prove Injury, Prejudice or Disadvantage

[¶43] "[T]he crux of a laches defense is a party's detrimental reliance on another's delay." *Winney v. Jerup*, 2023 WY 113, ¶ 20, 539 P.3d 77, 83 (Wyo. 2023) (*Winney II*) (citing *Tram Tower Townhouse Ass'n*, 2022 WY 58, ¶ 50, 509 P.3d at 368). "[T]he party asserting the doctrine of laches must show that he relied upon the plaintiff's actions and changed his position in reliance thereon to his prejudice." *Tram Tower Townhouse Ass'n*, ¶ 50, 509 P.3d at 368 (quoting *Hammond v. Hammond*, 14 P.3d 199, 201 (Wyo. 2000)).

[¶44] The Schroths assert they were prejudiced because they made substantial investments in the Winery, which they would not have done if the Kirks "or anyone" had brought a claim the Covenants precluded the Winery's operations. They assert: "In total, in reliance upon approvals granted by the HOA and Teton County, and the lack of any opposition from their neighbors within the Dairy Subdivision, and absence of any attempt to enforce the Covenants, the Schroth family has invested over $600,000 in the business, and many thousands of hours of personal time and hard work." They claim permitting the Kirks to enforce the Covenants now and "shut down the Winery, after the time and treasure that the Schroth family has committed to growing its Winery business and making physical improvements to the property is profoundly unjust and inequitable."

[¶45] The facts in the record show Appellants did not act in reliance on anything the Kirks did or did not do. The Schroths did not start making improvements to the Winery until after the 2015 CUP was granted. Although they claim those improvements were made in reliance on the issuance of that CUP, the Schroths' application said there would be no additional development, no new buildings, "private" tastings would be held inside existing buildings, there would be no public tours, and wine would only be sold for off premises consumption. There was nothing in this application that would have alerted the Kirks or any other owner in the Dairy Subdivision that the Schroths intended to undertake substantial remodeling of their barn, tear down and rebuild a building, or install additional landscaping to improve their patio to hold tastings. There is no evidence in the record the

Schroths applied to the Design Committee for a building permit for these improvements, even though Section 5 of the Covenants required a permit whenever a "building, structure, . . . improvement of any kind" was going to be "erected, placed, altered, added to, [or] reconstructed[,]" or the "removal of trees or other vegetation" was going to be commenced. The Schroths did not seek permission from the Design Committee or the HOA before erecting the tent, even though tents are prohibited by Section 7(j) of the Covenants. Although the Kirks became aware in 2020 that the tent had been erected, they believed it was a temporary Covid precaution. They did not know the Schroths intended to keep using the tent after the pandemic. The Schroths operated beyond the limited permission granted by the Design Committee in 2010 and eventually beyond those activities they sought permission from Teton County to conduct in the 2015 CUP application. The improvements made in 2019 and 2020 were not done in reliance on any permission from the HOA or Teton County or any inaction from surrounding homeowners who had no notice the Schroths intended to expand their activities beyond those listed in the 2015 CUP application.

[¶46] Further, Appellants benefited from any delay. Appellants were allowed to operate a commercial enterprise in a residential neighborhood for years. The Winery grew from an operation that generated a little over $100,000 in 2012 to one that generated more than $2 million in 2022. The Winery received the benefit of operating in the Dairy Subdivision and not paying rent for a commercially zoned property, even after it exceeded the limitations for home occupations in the Teton County LDRs and should have relocated to a more appropriate location. *See* Teton Co. LDRs §§ 6.1.11 (E)(1), (E)(3)(a), (c), (j). In addition to the profits they received from the Winery, the Schroths admit the improvements they made to Lot 3B increased the value of their property. Because Appellants benefited from any alleged delay, they cannot establish laches. *See Tram Tower Townhouse Ass'n*, ¶ 50, 509 P.3d at 368 (citations omitted).

[¶47] Appellants failed to show inexcusable delay, reliance, or injury and realized a significant benefit from any delay in the Kirks filing this suit. Therefore, the district court did not abuse its discretion when it declined to apply laches to bar the Kirks' claims.

### III. *Did the district court abuse its discretion when it found the equities weighed in favor of granting the Kirks a permanent injunction?*

[¶48] Section 9 of the Covenants authorizes the HOA board, the Design Committee or any lot owner within the Dairy Subdivision to enforce the Covenants. That provision states in relevant part:

> Every owner of a lot within the property hereby consents to the
> entry of an injunction, judgment or lien against him or her or
> his or her tenants or guests, to terminate and restrain any

16

> violation of these covenants or for the nonpayment of assessments due.

The district court found this provision meant the Schroths expressly consented to the entry of an injunction. However, despite this provision, the district court still considered the equities and found they weighed in favor of the Kirks. Appellants assert the district court's conclusions regarding the weighing of the equities is "entirely unsupported." The Kirks assert the district court was not required to weigh the equities because under Section 9 of the Covenants, the Schroths consented to the entry of the injunction. Alternatively, they assert the district court appropriately considered and addressed the applicable factors.

[¶49]  Even when an injunction is authorized by a contract or statute, the decision to grant an injunction is committed to the district court's discretion. *Winney II*, 2023 WY 113, ¶ 26, 539 P.3d at 85 (citing *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 9, 215 P.3d 1054, 1058 (Wyo. 2009)). "Whether an injunction will be issued depends on a weighing of the equities." *Id.* at ¶ 27, 539 P.3d at 85 (citing *Bd. of Cnty. Comm'rs of Teton Cnty. v. Crow*, 2006 WY 45, ¶ 16, 131 P.3d 988, 994 (Wyo. 2006)). Factors the district court should consider when weighing the equities include the gravity and willfulness of a violation, the delay in asserting one's rights, and the discrepancy between the costs and benefits of an injunction. *Id.* (citing 42 Am. Jur. 2d *Injunctions* § 15 (May 2023 update)). We review the district court's decision to grant injunctive relief for abuse of discretion. *Olsen v. Kilpatrick*, 2007 WY 103, ¶ 9, 161 P.3d 504, 507 (Wyo. 2007). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Winney II*, ¶ 14, 539 P.3d at 82 (quoting *Evans v. Sharpe*, 2023 WY 55, ¶ 25, 530 P.3d 298, 307 (Wyo. 2023)). "A district court does not abuse its discretion if it could reasonably conclude as it did." *Id.* (quoting *Evans*, ¶ 26, 530 P.3d at 307).

### A.  The Gravity and Willfulness of the Violation

[¶50]  The district court found the gravity of the Schroths' violation was serious. They had turned a home hobby of making wine into a full-fledged commercial business that engaged in commercial and industrial activities prohibited by the Covenants. The district court also found the Schroths acted willfully, noting Robert is a licensed attorney and he should have known how Covenants work, and the limited permission granted to him in 2010 and the approvals from Teton County did not excuse his performance with the Covenants.

[¶51]  The Schroths exceeded the limited scope of the permission granted by the Design Committee in 2010 and went from making wine in their barn and taking it to sell in town to shipping wine to multiple states, selling wine and merchandise on Lot 3B, and holding large, public wine tastings on Lot 3B. Further, as discussed above, beginning in 2017, the

Schroths began operating beyond the scope of the 2015 CUP and the representations they made in that application, and in 2019–2020, they made improvements to Lot 3B without complying with the building permit process set forth in the Covenants. The district court reasonably concluded the gravity and willfulness of the violation weighed in favor of granting the injunction.

### B. The Kirks' Delay in Enforcing their Rights

[¶52] The district court found the Kirks did not significantly delay in enforcing their rights, and there was no evidence the Schroths or the Winery had expended significant funds during this delay. As discussed above, the Winery's activities expanded over time, and it was not until they attended the event at the Winery in 2020 that the Kirks had any reason to suspect the Schroths were operating beyond the scope of the 2010 permission and violating the Covenants. The Kirks filed suit in 2022 after it became clear the Winery had no intention of relocating and the HOA had no intention of enforcing the Covenants. The district court reasonably concluded the Kirks did not delay in enforcing their rights, and this factor weighed in favor of granting the injunction.

### C. The Benefits of the Injunction Outweigh the Costs

[¶53] The district court found the benefits of the injunction outweighed the cost. It found granting the injunction would allow the property to revert to its proper purpose and enforcing the covenants would preserve and maintain the natural character and value of the property. The district court further found enforcing the Covenants would not require the Schroths to deconstruct or remove any buildings on their property, and the improvements the Schroths had made enhanced the value of Lot 3B. The cost the Schroths would incur is that they would have to stop the expanded activities and go back to making wine in the garage or barn, and perhaps find another location to store some of their equipment. The district court found this was not a heavy burden on the Schroths because they had already rented a large warehouse, opened a retail store and satellite tasting rooms in other locations, and paid themselves $6,000 a month in rent, which could be used to secure another location.

[¶54] The district court's conclusions are reasonable. The Winery will not have to shut down or cease operations. Instead, it will have to relocate some of its operations to a more appropriate location. The aspect of Lot 3B they may not be able to replicate at those other locations is the "breathtaking views of Jackson Hole," and as Robert admitted in his deposition, it is these views they want to maintain for their customers. However, the purpose of the Covenants is "to preserve and maintain the natural character and value of the property for the benefit of all of the owners of the property or any part thereof[,]" not for the customers of the commercial business any owners of those properties may attempt to run on those properties in violation of the Covenants. Section 7(c) of the Covenants makes clear home occupations were not to be open to the public. Even the Teton County LDRs restrict public access to home business wineries and expect these businesses to

18

relocate when they reach a level requiring such access. The injunction does nothing more than require a successful commercial enterprise to relocate most of its activities to appropriately zoned locations in accordance with the Covenants and Teton County's LDRs. Appellants presented no evidence this remedy "would create a hardship or injustice that is out of proportion to the relief sought." *Winney II*, 2023 WY 113, ¶ 27, 539 P.3d at 85–86 (quoting *Perel v. Brannan*, 594 S.E.2d 899, 904–05 (Va. 2004)). The district court did not abuse its discretion when it found the benefits of the injunction outweighed the costs, and this factor weighed in favor of granting the injunction.

[¶55]   The district court weighed the equities and found the Schroth's behavior was willful and the Kirks did not delay in enforcing their rights. The district court did not abuse its discretion when it granted the Kirks a permanent injunction.

## CONCLUSION

[¶56] Appellants' expanded activities are commercial and violate the Covenants. Appellants failed to prove the elements of inexcusable delay, reliance, or prejudice, and the district court did not abuse its discretion when it declined to apply laches to bar the Kirks' claims. The district court did not abuse its discretion when it found the equities weighed in favor of granting the injunction. Affirmed.

19